### HARLAN v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. February 23, 1909.)

No. 1,695.

In Error to the Circuit Court of the United States for the Northern District of Florida.

W. S. Harlan was convicted of peonage, and brings error. Affirmed. See, also, 214 U. S. 519, 29 Sup. Ct. 700, 53 L. Ed. 1065.

Application for writ of habeas corpus was denied, and denial affirmed by the Supreme Court (218 U. S. 442, 31 Sup. Ct. 44, 54 L. Ed. 1101), and thereafter application was made for pardon, and the following is a copy of the memorandum of the President in passing on such application:

W. S. Harlan is the manager of a great lumber and turpentine company doing business in Florida and Alabama. With two or three other employés of the company he was indicted in the United States court for Florida for conspiracy to violate the peonage statutes—that is, to compel a laborer against his will to return to the company and work out a debt owing by the laborer to the company. He was tried and convicted, with two others, and was sentenced to 18 months in prison and to pay a fine of $5,000. The judgment was carried for review to the United States Circuit Court of Appeals of the Fifth Circuit, and was there affirmed; one judge, Judge Pardee, dissenting. An application to the United States Supreme Court for a writ of certiorari to review the judgment was denied.

Upon application for pardon, I signed a memorandum directing the Attorney General to prepare for my signature a formal warrant commuting the imprisonment part of the sentence to six months. A proceeding in habeas corpus was then begun and carried to the Supreme Court to test the validity of the sentence collaterally, and the sentence was upheld. Application for pardon has now been renewed.

Mr. Harlan is a man of great enterprise and of good business reputation, and has invoked and secured the sympathy and assistance of all who favor the industrial development of the country in the neighborhood of his activities in the South, as well as of many prominent citizens of Iowa, where he was born and lived for a large part of his life. They have intervened with much earnestness in his behalf. All this has led me to examine the case with great care.

Mr. Harlan was indicted on two charges of conspiracy. He was tried twice on different indictments. He was convicted on the first indictment, and acquitted on the second. The two cases covered the same general subject-matter, and the records in the two cases embraced 1,800 printed pages of evidence. I have read the records in full in each case.

The offenses charged grew out of the effort of Mr. Harlan's Company to secure 180 laborers from New York, including quite a number of recent Hungarian, Bulgarian, and other immigrants. They were brought in parties of from 12 to 25 by sea to Savannah, and thence to the company's plant, situate partly in Alabama and partly in Florida, near the line between the states. The contract of the company with each laborer stipulated for a certain wage per day, and provided for a repayment to the company out of wages earned of the cost of his transportation, $18, from New York. The evidence clearly showed that on the way from Savannah to the company's settlement a number attempted to escape, and were physically detained and brought to the place of work. There was also much evidence to show that physical punishment, if escape were attempted, was inflicted, among the foreign laborers at the turpentine and logging camps of the company, by whipping those who attempted to leave the company's employ before working out their debt to the company. The testimony was specific and detailed in cases of attempted escape of such laborers, showing their pursuit, capture, terrorism by display of revolvers, and, in one or more instances, actual whippings.

The first indictment charged against Harlan and others a conspiracy to arrest and return to peonage and service one Rudolph Lanninger. Lanninger was one of those who attempted to escape on his way to the camp from Savannah. He was captured and carried to the camp. It was his second attempt to escape and his capture that formed the basis of the indictment on which Mr. Harlan was convicted.

Mr. Harlan's counsel and his earnest advocates and friends urge that the evidence does not connect him with the pursuit of Lanninger, his capture, or his compulsory return to service, or with any system of terrorism, and they deny his knowledge or responsibility for them, and affirm his complete innocence.

I am sorry to disagree entirely with this view. The men who actually pursued, terrorized, arrested, and returned to service Lanninger and the others were in the employ of the company doing its business. Harlan was general superintendent, and the men who acted were his subordinates. It is true that the company's business was divided into a mill plant, a turpentine camp, and a logging camp four or five miles apart, and that Mr. Harlan's office was at the mill, and that the escapes and whippings were at the camps or in the woods; but it is very clear that Mr. Harlan arranged for bringing these foreigners, that he was actively interested in arranging for their work, that he directed by telegram the arrest of two foreigners who were reported to him to have escaped, and that he instigated four or five illegal and unfounded criminal prosecutions in a justice court against employés, in order to compel them to return to the company's employ and resume work under a contract.

Finally, he wrote a letter to a newspaper, in which he denied charges of cruelty and mistreatment of men by his subordinates, but in which he in effect admitted that men had attempted to escape from his employ, and that, where they were under contract, they were constrained to remain.

After reading all the evidence in the case in which Mr. Harlan was convicted. I am convinced beyond reasonable doubt that the pursuit, capture, return to service, and forcible retention of Lanninger was only one act of a number of similar acts which were in pursuance of a well-understood and approved plan, authorized by Mr. Harlan, to secure and retain needed labor of this imported kind for his business. It is utterly immaterial that he may never have known nor heard of Lanninger, or of the particular subordinates who pursued and arrested him, if, as was the fact, it was all done in pursuance of a system or plan he approved.

Complaint is made of the conduct of the trial by the District Judge. I cannot find that the defendant was prejudiced by the judge's course.

Upon the suggestion that Mr. Harlan had not made as complete a defense

in the first case, when he was convicted, as in the second case, in which he was acquitted, I have read the second case through, and my conviction that Mr. Harlan was privy to the whole peonage plan has been strengthened.

The government of the United States has been at great pains and cost to suppress peonage. It is much more likely to be maintained successfully where, as in these cases, the laborers are foreigners, and do not speak English, and hardly know their rights. It is a kind of offense that is regarded lightly in some communities. If permitted to live at all, it will spread rapidly its demoralizing influence. When, therefore, a man of high business standing and large enterprises is convicted of the offense, the punishment should be such as to deter others from the practice. Fines are not effective against men of wealth. Imprisonment is necessary. I am well aware of the grievous character of confinement in jail to a man of Mr. Harlan's standing, and I should be glad to yield to the urgent appeals of his many friends, but I cannot do so. I believe him to be guilty of the charge of which he has been convicted. To retain and enforce the imprisonment part of the sentence will operate powerfully to prevent a recurrence of such offenses by men of large affairs and business standing. To relieve such a one from the penalty of imprisonment, when properly convicted and sentenced, would be to break down the authority of the law with those of power and influence, and would tempt on their part further breaches. What is worse, it would give real ground for the contention so often heard that it is only the poor criminals who are really punished.

As I have already said, I signed, upon a previous application for pardon, a memorandum directing the preparation of formal papers reducing the imprisonment part of the sentence from 18 months to 6 months. The counsel for the applicant learned of this fact, and in the habeas corpus proceeding, which was brought before Judge Jones, one of the grounds for the release of the defendant, Mr. Harlan, was that I had issued an order of commutation reducing the imprisonment from 18 months to 6 months, and that, as a sentence of 6 months could not, under the law, be executed in the penitentiary to which Mr. Harlan had been sentenced, it could not be executed anywhere, and therefore he must be given his liberty. As a matter of fact, the instrument commuting Mr. Harlan's sentence from 18 months to 6 months was never executed. The sentence of 18 months is therefore in full force. In order to prevent the use of such a technicality in the future to avoid the sentence, I shall make no order of commutation, but shall allow the sentence to stand until after the defendant is imprisoned, and then shall exercise such executive clemency as I may be advised that the case requires.

The present application is denied, and the sentence will be executed.

[Signed]   Wm. H. Taft.

W. W. Flournoy, E. C. Maxwell, and L. J. Reeves, for plaintiff in error.

W. W. Howe, Rufus E. Foster, R. P. Reese, and John P. Stokes, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PER CURIAM. In the opinion of a majority of the judges, no reversible error is patent on the face of the record. The judgment of the Circuit Court is therefore affirmed.

Certiorari to review this decision was denied by the Supreme Court. 214 U. S. 519, 29 Sup. Ct. 700, 53 L. Ed. 1065.